UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| ISABEL STEVENS, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| V. | ) | Civil Action No. 1:11-cv-00218-PB |
| | ) | |
| LIBERTY MUTUAL GROUP, INC., | ) | |
| | ) | |
| DEFENDANT | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO AMEND COMPLAINT

NOW COMES the Plaintiff, Isabel Stevens, by and through her attorney, LYONS LAW OFFICES, P.A., and hereby respectfully submits this Memorandum of Law in Support of Motion for Leave to Amend Complaint and in support thereof states the following:

## I.      INTRODUCTION

The Plaintiff, Isabel Stevens (hereinafter "Stevens") on September 10, 2010 filed a Charge of Discrimination with the New Hampshire Human Rights Commission.  After one hundred eighty days (180) days she filed a Complaint against Defendant alleging claims of age discrimination (Count I), constructive discharge (Count II), wrongful termination (Count III), fraud (Count IV), undue influence (Count V), fraudulent misrepresentation (Count VI), negligent misrepresentation (Count VII), and enhanced compensatory damages (Count VIII) in the State of New Hampshire Strafford County Superior Court.  The Complaint filed by the Plaintiff was sufficient as to form and substance to bring forward State Court claims.

Defendant, based on diversity of jurisdiction, removed Plaintiff's claim to this Honorable Court.

1

In that Plaintiff filed her claims in the State Court, she did not bring a Count for Violation of Age Discrimination pursuant to the Age Discrimination and Employment Act (hereinafter "ADEA").

The Structuring Conference in this matter is not scheduled until July 6, 2011.

## II.    RELEVANT FACTS

Stevens was born on September 21, 1951 and began working at Liberty on May 30, 1991. Stevens was initially hired as a part-time data entry person.  Within three months she was hired full time and oversaw the part-time work staff.  Thereafter Stevens received steady employment upgrades and salary increases.  Stevens worked as an Associate Financial Analyst in the Financial Department for approximately five (5) years beginning in 2005.   Stevens was wrongfully terminated and constructively discharged by Liberty on April 7, 2010.  (Compl. ¶¶5-7)

Throughout her employment history with Liberty, Stevens received steady-pay increases until she was wrongfully terminated and constructively discharged as a top wage earner with an annual salary of $48,500.00.   Throughout her employment history with Liberty, Stevens received awards and commendations, including a Chairman's Award, 2009 Safeco Implementation award and annual VIP bonus awards.  Throughout her employment history with Liberty, and until Stevens was wrongfully terminated and constructively discharged, Stevens did her job well and received positive annual performance evaluations.  (Compl. ¶¶8-10)

In January of 2010 Stevens' supervisor Terry Bryant (hereinafter "Bryant") told Stevens that upper managers wanted to get rid of "the older people in the department" and that she was one of the older people.  (Compl. ¶12)

Stevens had previously been advised by Bryant, that Bryant had been told by Jana

Pasquini (hereinafter "Pasquini"), who was a Liberty Human Resources Supervisor, that "performance management is a tool used by Liberty to put employees under enough stress that they would leave on their own accord".  Stevens was advised by Bryant that specific discussions with Liberty supervisors occurred in which supervisors discussed getting rid of the "old ones." Stevens is aware of five (5) middle aged, high salaried employees who were forced out and replaced by younger men or women.  Specifically, Mary Caldwell who was in her mid-forties and was subjected to severe "performance management" until she quit and was replaced by Sara Cotter, age 28. Joan Lozier in her mid-forties who was subjected to significant "performance management" and replaced by a younger man.  Terry Bryant who was in her mid-forties, subjected to "performance management" and then laid off.  Linda Gavin in her mid-forties who was subjected to significant "performance management" and was replaced by Jennifer Berrios. Margaret Trefethen in her late-forties who was subjected to significant "performance management" and after she was terminated Liberty hired a younger woman.  Stevens during her employment with Liberty had personal knowledge of Liberty supervisors make multiple discriminatory comments regarding an employees' age and forcing the reassignment, constructive discharge and termination of older workers. (Compl. ¶¶33-36)

Immediately after receiving the warning from Bryant, Liberty gave Stevens a new job requiring her to do twin valuations requiring a minimum of two extra hours of work every day which made the job impossible to accomplish as she already had a significant work load. Liberty knew that Stevens' work load was more than one person could handle.  (Compl. ¶¶13-14)

On February 9, 2010, Stevens took a medical leave to have surgery for a deviated

septum.  When Stevens returned to work on February 22, 2010 Bryant had been terminated.
When Stevens returned Sara Cotter (hereinafter "Cotter") and Jennifer Berrios (hereinafter
"Berrios") were now Stevens' supervisors. Immediately upon her return from medical leave
Berrios started making comments and asked Stevens whether or not she had the "energy" and
"ability" to do her job.  Upon Steven's return following her medical leave, Berrios began to
make impossible and unreasonable demands on Stevens.  Before taking her medical leave for the
deviated septum, Stevens knew that Berrios discouraged and looked unfavorably on employees
requesting time off even in cases of illness and family emergencies.  Upon Steven's return from
medical leave, Berrios continued to insist that Stevens report to work without regard to her
medical condition. (Compl. ¶¶15-21)

On March 2, 2010 Stevens had a meeting with Pasquini who began to put pressure on
Stevens to agree to a mutual termination.  Upon Stevens return from medical leave and
continuing after her meeting with Pasquini, employee meetings became difficult.   Liberty
continued to simply increase Stevens' work load so she couldn't possibly keep up resulting in
additional health issues.  (Compl. ¶¶22-24)

On March 23, 2010 Stevens met with Pasquini and advised Stevens she only had "a
few options."  Stevens could quit which would preclude Stevens from collecting unemployment.
Berrios could begin disciplinary action and Stevens would be terminated, with Stevens'
employment file noting that Liberty terminated her for gross misconduct which would prevent
Stevens from collecting unemployment.  Stevens could agree to "mutual termination."  Pasquini
told Stevens that in "this economy it would be difficult to find a job" and her financial situation
would be greatly harmed if she chose option "a" and could not collect unemployment.  When

Stevens met with Pasquini she told Pasquini that she felt that she was being forced out of the company.  (Compl. ¶¶25-27)

On April 6, 2010 Stevens had a follow-up doctor's appointment related to her surgery.  When Stevens returned to work following her April 6, 2010 appointment Cotter brought Stevens into Berrios' office where Berrios began to scream at Stevens about the medical appointment and berating Stevens about her work performance generally. No one during her approximately nineteen (19) years at Liberty had ever questioned or even made a negative comment about Stevens' work performance prior to the April 6, 2010 meeting with Cotter and Berrios.  (Compl. ¶¶28-30)

On April 7, 2010 Stevens was called into a meeting with Pasquini and Valencia Augusta (hereinafter "Augusta"), another Liberty Human Resources Supervisor, both of whom subjected Stevens to the continuing course of pressure Stevens had experienced since her return from surgery and who advised her that unless she agreed to a mutual termination she would receive no severance.   (Compl. ¶31)

On April 7, 2010 Stevens was coerced into signing a Severance Agreement and General Release (hereinafter " Severance Agreement") that is attached hereto as Exhibit A. When Stevens was presented with the Severance Agreement she did not want to nor had any intention of ending her employment with Liberty Mutual.  (Stevens AFF. ¶¶7-8)

Stevens found the Severance Agreement to be confusing and hard to understand. In the last paragraph of the second page of the Severance Agreement, after a list of various matters, appeared the following language:

> Notwithstanding the foregoing or Section 6 below, Employee is not waiving his or her right to bring claims that cannot be released as a matter of law.

When Stevens was presented with the Severance Agreement Stevens specifically asked the Liberty Mutual Human Resource Officer Jana Pasquini about this language.  Stevens was specifically told by Pasquini that by signing the Severance Agreement that she was not giving up any of her rights to bring a claim and that the language only protected Liberty if they did no wrong.  The title of the Severance Agreement was "Severance Agreement and General Release." As a result, the title of the Severance Agreement led Stevens to believe she was only being coerced into signing a severance agreement and not a general release.   Stevens' belief was partially based on the fact Sections 2, 3, and 4 of the Severance Agreement dealt with severance payments.  Stevens' belief was only enhanced by the explanation given to her by Pasquini on behalf of Liberty. (Stevens AFF. ¶¶9-11)

Stevens also understood the Severance Agreement simply dealt with severance because the amount of severance she was being paid correlated exactly to the amount of severance she was entitled to receive based on the Liberty Severance Pay Plan.  Stevens also understood the document to simply be an agreement as to severance as she was not being provided or being paid anything other than what she was entitled to pursuant to the Liberty Mutual Severance Pay Plan.  Stevens was not being paid any additional money for any other reason or release of claims. Section 2 of the Severance Agreement provided that she was being paid by Liberty pursuant to and subject to the Liberty Mutual Severance Pay Plan.   The Liberty Mutual Severance Pay Plan and references thereto contained within the Employee Handbook are attached hereto as Exhibit B.   Again, because the Severance Agreement was referred to as a Severance Agreement and General Release and Section 2 talked about payment pursuant to the Liberty Severance Plan, it was Stevens' belief that the Severance Agreement only dealt with severance. Stevens believed the Severance Agreement was simply a severance agreement

because Pasquini only referred to it and kept calling it a "severance agreement." (Stevens AFF,

¶¶12-15)

Stevens was also specifically told by Pasquini that it was not necessary for her to

talk to a lawyer as the Severance Agreement was only about being able to receive severance and

unemployment.  Stevens was specifically told by Pasquini that if she didn't sign what Pasquini

referred to as "Severance Agreement" Stevens would not receive unemployment benefits.

(Stevens AFF. ¶¶16-17)

After Stevens was terminated, she was replaced by a former college intern, Bennett

Turner who was in his mid-twenties, and Sean LeBlanc who was in his mid-twenties.  (Compl.

¶38)

Liberty's Employee Handbook provides that prior to any term employees will "be

warned that your performance is unsatisfactory and counseled about the specific changes that are

required to bring your performance to satisfactory levels."  No performance warning or

counseling was provided by Liberty to Stevens prior to April 7, 2010.  Liberty's Employee

Handbook provides "if your job performance continues to be unsatisfactory you will be placed

on probation…If your performance during the probationary period does not improve, you may be

reassigned or your employment will be terminated."  Stevens was never actually placed on

probation by Liberty at any time.  Liberty's Employee Handbook provides that Liberty

guarantees equal opportunity to all and prohibits discrimination because of age.  (Compl. ¶43-47)

Liberty's actions were motivated by malice and/or bad faith as it was Liberty's intent

to force Stevens out as an older and higher paid wage and benefit earner in favor of a younger,

less expensive worker.   Liberty's actions were motivated by malice and/or bad faith as it was

Liberty's intent to force out older workers in favor of younger, less expensive workers.   Stevens,

7

after being constructively discharged and wrongfully terminated, immediately made every reasonable attempt to mitigate her damages by finding other employment, but to date has been unable to do so.  (Compl. ¶48-50)

Finally, Plaintiff brought claims for fraud, undue influence, fraudulent misrepresentation, negligent misrepresentation, and enhanced compensatory damages, relating to Defendant's actions relative to the way she was forced, coerced, and misled into signing the Severance Agreement and General Release.

Plaintiff also respectfully requests this Court to review the Affidavits of Margaret Trefethen (hereinafter "Trefethen") and Terry Bryant (hereinafter "Bryant") that are attached hereto and incorporated herein.   Trefethen and Bryant have also filed claims with this Honorable Court.   They were subjected to an identical course of conduct by Defendant as set out in their Affidavits.  The Affidavits of Plaintiff, Bryant, and Trefethen, taken together, establish a consistent course of conduct devised by Liberty intended to force out workers and coerce and trick them into signing severance agreements which are confusing to the average employee without paying any consideration beyond what these women were entitled to.

### III.   **STANDARD OF REVIEW**

Plaintiff brings this Motion for Leave to Amend the Pleadings based on Rule 15 (a)(2) of the Federal Rules of Civil Procedure.  This rule provides that a party may amend its pleadings with leave of the Court which should be given freely when justice so requires.

### IV.   **AGRUMENT**

Plaintiff originally filed her claims in the State of New Hampshire Strafford County

Superior Court. Plaintiff brought a claim for age discrimination pursuant to NH RSA 354-A, along with other common law claims.   The Complaint filed in State Court by the Plaintiff was sufficient as to form and substance to bring the State claims forward.

Defendant has now removed the Complaint to this Honorable Court based on diversity of jurisdiction.

Plaintiff now seeks to amend her Complaint pursuant to Rule 15 (a)(2) by adding a Count under ADEA and further clarifying her State Age Discrimination Claim.

There is no surprise or prejudice to Defendant by adding a Count under ADEA, as this Claim is consistent with Plaintiff's previously filed claims.

Rule 12 (a)(2) provides leave of Court should be freely given when justice so requires.   In this case, justice so requires in that Plaintiff's claim was removed by Defendant to this Honorable Court. Additionally, no prejudice will befall the Defendant nor undue delay forced upon this Honorable Court in that the Structuring Conference in this matter is not scheduled until July 6, 2011.

Respectfully Submitted,
ISABEL STEVENS
By her attorneys,
LYONS LAW OFFICES, P.A.

Date:   June 22, 2011                     By:      /s/John E. Lyons, Jr._____
                                          John E. Lyons, Jr. (NHBA#1535)
                                          Lyons Law Offices, P.A
                                          One New Hampshire Ave., Ste 235
                                          Portsmouth, NH 03801
                                          603-431-5144
                                          JLyons@lyonslaw.net

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via Electronic Filing and US Mail on: Nancy E. Oliver, Esq., 100 International Drive, Suite 363, Portsmouth, NH 03801, counsel for Defendant.

Date:   June 22, 2011                     /s/John E. Lyons, Jr._____
                                          John E. Lyons, Jr.

10