**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Isabel Stevens</u>

   **v.**                                    Civil No. 11-cv-00218-PB
                                         Opinion No. 2013 DNH 104
<u>Liberty Mutual Group Inc.</u>


<u>**MEMORANDUM AND ORDER**</u>


    Isabel Stevens, a former Associate Financial Analyst in the
financial department at Liberty Mutual Group Inc. ("Liberty
Mutual"), signed a Severance Agreement and General Release
("Agreement") upon her separation from Liberty Mutual releasing
all legal claims against her employer in exchange for severance
pay.  She subsequently filed suit alleging violations of various
federal and state anti-discrimination laws relating to her
discharge.  Liberty Mutual answered the complaint, denying
liability and asserting counterclaims against Stevens for breach
of contract, unjust enrichment, and fraud.  Liberty Mutual now
moves for summary judgment, arguing that Stevens waived her
claims when she knowingly and voluntarily executed the
Agreement, and, even if Stevens did not waive her claims,
Liberty Mutual is entitled to judgment as a matter of law.
Liberty Mutual also moves for summary judgment with respect to

its counterclaims.

Stevens objects to Liberty Mutual's motion, arguing that the Agreement is unenforceable because she was fraudulently induced to sign it and was under duress at the time. She also argues that the defendant's motion for summary judgment should be denied because the parties dispute material facts. Because I conclude that the severance agreement and general release are enforceable, and Stevens' claims are within the scope of the release, I grant the defendant's motion for summary judgment (Doc. No. 49) with respect to Stevens' claims against Liberty Mutual without reaching the merits of those claims. I deny the motion with respect to Liberty Mutual's counterclaims against Stevens.[1]

---

[1] Liberty Mutual's counterclaims are premised on its view that Stevens violated the Agreement by initiating this lawsuit. The counterclaims do not appear viable for the following reasons. First, Liberty Mutual's claim for breach of contract (alleging that Stevens filed suit in violation of the Agreement) is unlikely to succeed because, "[f]airly construed, [Stevens'] complaint seeks not simply damages for unlawful termination but, necessarily, a judicial determination that the Severance Agreement is not enforceable." Bryant v. Liberty Mut. Grp., Inc., No. 11-cv-217-SM, 2013 WL 2403483, *11 (D.N.H. May 31, 2013). Liberty Mutual does not argue that Stevens waived her right to seek such a determination. Liberty Mutual's claim for unjust enrichment is similarly unlikely to succeed because, in light of the court's decision that the Agreement is enforceable, Stevens is entitled to retain her severance pay. See id.

## I.   <u>BACKGROUND</u>[2]

Stevens graduated from Traip High School in Kittery, Maine, in 1969.  Tr. 79.  She never attended college, but successfully completed courses in Excel and Access while employed at Liberty Mutual.  Tr. 79-80.

Stevens started working at Liberty Mutual as a part-time employee in May 1991 and transitioned to full-time employment within three months.  Tr. 17.  She initially held a data entry supervisory position in the disbursements department.  Tr. 18. Beginning in 2005, she worked as an associate financial analyst and continued in that position until 2010 when she separated from Liberty Mutual.  Tr. 18-19.

In 2009, Stevens spoke with her supervisor, Terry Bryant, to express her concern that her workload was too heavy.  Tr. 23-24.  Bryant told Stevens that she would talk to management, and,

---

Finally, the record does not appear to support Liberty Mutual's claim for fraud, specifically, that Stevens misrepresented her intention to comply with the Agreement.  If Liberty Mutual pursues these claims, Stevens will be entitled to address them in a motion to dismiss.

[2] The summary of facts is taken primarily from Stevens' sworn testimony during her December 11, 2012, deposition.  Doc. No. 49-4.  I present the facts in the light most favorable to the non-moving party, which, in this case, is the plaintiff.

a month later, Stevens learned that management had instructed
Bryant to conduct a work study to evaluate her workload.  Tr.
24-25.  Following completion of the work study, management
concluded that Stevens had too much work.  Tr. 25.

Around the same time, Stevens began experiencing medical
problems, including a lump in her nose that caused bleeding, and
learned that she needed surgery for a deviated septum.  Tr. 43.
Liberty Mutual approved Stevens' medical leave for February 9,
2010, to February 22, 2010.  Tr. 28, 44.  Based on the work
study, Stevens believed that her workload would be reduced when
she returned from medical leave.  Tr. 26.

While Stevens was on medical leave, her supervisor, Bryant,
separated from Liberty Mutual.  Subsequently, Bryant made
several statements to Stevens that made Stevens believe Liberty
Mutual was seeking to get rid of older employees.  Although Sara
Cotter, Stevens new manager, told Stevens that Stevens did not
have to worry about losing her job, Tr. 31, Bryant told Stevens:
"Remember what I told you, that they're after the older people."
Tr. 32.  Stevens believed Bryant was implying that Stevens might
be fired because of her advanced age, despite Cotter's
assurances to the contrary.  Tr. 32.  Bryant also told Stevens

4

that she heard that the company "wanted to get rid of the older people and that I was targeted."  Tr. 36.  Bryant told Stevens that two other older women were being targeted.  Tr. 39-40.

Stevens also believed that Liberty Mutual wanted to get rid of older employees because she heard a statement made by another employee, Mark Griffin, that Bill McQuillan (also an employee) was "too old, he shouldn't be working here still."  Tr. 145-46.

On February 19, 2010, Stevens emailed Cotter and Jennifer Berrios, another manager, to let them know that her doctor had cleared her to return to work, but had told her that she would need to have a stress-free work environment.  Tr. 46-47. Stevens and Liberty Mutual agreed that upon her return, Stevens would work part-time processing W-9s, which was less complicated work than the work she performed prior to her surgery.  Tr. 47-48.  On February 22, 2010, Stevens returned to work part-time, Tr. 48, though her salary stayed the same.  Tr. 52.  Stevens and Liberty Mutual agreed that she would continue processing W-9s on a part-time basis until her doctor cleared her for full-time work.  Tr. 48.  Cotter told Stevens that, once she went back to full-time work, her workload would be the same as it was before she went on medical leave, in spite of the fact that Bryant had

promised Stevens a workload reduction.  Tr. 27.  Stevens also
learned that, once she resumed full-time employment, she would
be assigned two additional hours of work per week on top of the
duties she performed prior to taking medical leave.  Tr. 112.

Stevens said that when she returned on February 22,
"[s]omething had changed."  Tr. 49–50.  According to Stevens,
"[t]he other supervisors weren't talking to me and . . . my
thought was that they were trying to get rid of me and the other
supervisors knew about it and they would – they were just
ignoring me.  The people who used to say hello to me didn't say
anything to me."  Tr. 50.

After her return to Liberty Mutual and in anticipation of
having to resume her full-time duties plus two additional hours
of work, Stevens met several times with Janna Pasquini,
Principal Human Resources Generalist, to discuss her options,
given that her workload was not going to change even though "it
was a proven fact that it was too much work for one person."
Tr. 63-65.  Pasquini suggested that Stevens retire or look into
getting another job.  Tr. 64.  Stevens asked if there were any
positions available in the financial department, and Pasquini's
"automatic answer was, 'No.'"  Tr. 64.

6

On March 1, 2010, Stevens emailed Cotter to tell Cotter that she was looking for other available positions in the company and considering retirement.  Tr. 65.  Stevens said that she was looking into these options at Pasquini's suggestion. Tr. 66.  Before Pasquini's suggestion, Stevens planned to retire at age 62 or when she was financially able to do so.  Id.  At some point, Stevens came to work early to look at the job board, and her badge was rejected.  Tr. 67.  Stevens believed she was being fired, though, in fact, her badge had not been programmed to work on the particular door she tried to enter.  Tr. 67–68. After exploring her options, Stevens concluded that there were no suitable positions posted, but she would not retire.  Tr. 67.

Around March 15, 2010, Stevens' doctor cleared her for work without restrictions.  Tr. 48–49.  She resumed the duties she performed prior to taking medical leave, and was never assigned the additional two hours of work per week that her supervisors had told her to expect.  Tr. 113.  Stevens was unable to recall any unreasonable demands that Berrios made on her after she returned from medical leave.  Tr. 141.

In a meeting with Pasquini around March 20, Pasquini told Stevens that Stevens "had three choices" if she felt she could

not perform her duties.  Tr. 75.  Stevens could (1) quit and forgo unemployment benefits; (2) continue working while undergoing performance management (Stevens understood this option to mean that she would be let go for gross misconduct and would not be able to collect unemployment); or (3) sign a severance agreement and collect severance pay and unemployment benefits.  Tr. 75.  Pasquini reiterated these three options on March 30, 2010.  Tr. 84.

Stevens discussed the options with her boyfriend.  Tr. 89. They concluded that she could not quit or undergo performance management because either option would require Stevens to forgo unemployment benefits, which they could not afford to do.  Tr. 89.

On April 6, Stevens' supervisors confronted her about her work performance for the first time since she began working for Liberty Mutual.  Tr. 55.  On that day, Stevens had a 10:00 a.m. meeting scheduled with Cotter, but she had to leave the office around 9:15 a.m. for a doctor's appointment and could not find Cotter or Berrios to tell them that she was leaving work for the appointment.  Tr. 55. In the past, when Stevens forgot to inform a supervisor that she needed to leave the office for an

appointment, it had not been a problem, and she did not expect
it to be a problem on April 6.  Tr. 56.

Stevens returned to work at 10:15 a.m., after her doctor's
appointment, and stopped by Cotter's desk where the meeting was
supposed to take place.  Tr. 59.  Cotter was not at her desk, so
Stevens went back to her own desk.  Tr. 60.  A short time later,
Cotter came to Stevens' desk and asked her to come to Berrios'
office with her.  Once there,

> Jen started yelling at me right away – she didn't give
> me a chance to explain what happened – saying how it
> was against policy to leave without telling a manager
> and that she had to miss a meeting because of my not
> being able to meet with Sara and that she felt that I
> was not doing my work and asked me if I had the energy
> and the ability to do my work.

Tr. 60-61.  Berrios told Stevens to return to her desk.  Stevens
said she felt "mortified."  Tr. 61.  Stevens returned to her
desk, and Cotter stayed in the office with Berrios.  Tr. 61.

That afternoon, Cotter brought Stevens into Berrios' office
and gave Stevens a verbal warning for leaving the office without
telling anyone and failing to talk frequently enough during
meetings.  Tr. 69-70.  Berrios was not present at that meeting.
Cotter told Stevens to write down the substance of the warning.
Stevens was aware of the company policy prohibiting employees

9

from leaving without telling a supervisor, but was unaware of any policy requiring her to speak during meetings.  Tr. 71. Stevens believed "that verbal warnings meant that they want to get rid of you."  Tr. 71.

The next day, Stevens told Pasquini that she had received a verbal warning, and Pasquini's "first words were, 'Then you should take the severance agreement,' so [Stevens] felt like [she] was being forced to do [so]."  Tr. 73.  Pasquini reiterated the three options Stevens had, and Stevens said in response, "Well, then you might as well bring the paperwork today."  Tr. 136-37.  Pasquini then told her, "I'll call you back and let you know what time we'll be there so you can do the severance."  Tr. 73.

At the deposition, defendant's counsel asked Stevens, "And what is your basis for saying that Janna [Pasquini] forced you and tricked you into signing the release?  What was the force and what was the trick?"  Tr. 149.  Stevens responded, "The force was that she didn't give me any other choice.  She said, 'Do this, this or this,' and none of the choices w[as] viable for me."  Tr. 149.  Pasquini "didn't say we'll try and find you another job, you know, or anything like that to help me."  Tr.

10

150.

Stevens testified that she did not want to continue working after receiving the verbal warning.  She believed that the warning meant that Liberty Mutual was trying to force her out of her position, and Stevens did not know of any avenue through which to challenge the verbal warning.

Around 9 a.m. on April 7, 2010, Stevens wrote an email to Irene Earle-Rice, a Senior Benefits Consultant, stating, "I have decided today is my last day at work.  Would you please send me the necessary paperwork to start retirement?"  Tr. 137. Nonetheless, Stevens testified at her deposition that when she was presented with the agreement in the afternoon on April 7, she did not want to end her employment with Liberty Mutual, and she had no intention of doing so.  Tr. 93.

Pasquini presented Stevens with the severance agreement and Valencia Augusta, the Human Resources Manager for the financial department, was present as a witness.  Tr. 93-95.  When Pasquini presented the Agreement, Pasquini explained that Stevens "needed to sign it in order to get unemployment."  Tr. 95.

Stevens did not read the agreement during the meeting, but Pasquini noted the provision in the document that stated,

"Notwithstanding the foregoing or Section 6 below, employee is not waiving his or her right to bring claims that cannot be released as a matter of law."  Tr. 100.  Pasquini also told Stevens that Stevens did not need to hire a lawyer.[3]  Tr. 171-72.

Stevens left the meeting with a copy of the severance agreement and a copy of a letter dated April 7, 2010, which stated that in order to receive severance pay, Stevens must sign the agreement and general release.  Tr. 101-02.  Defense counsel asked Stevens at her deposition whether she saw the language that stated, "Your decision to accept or reject the severance pay and outplacement services is voluntary and will in no way affect your receipt of the regular benefits outlined above."  Tr. 103.  Stevens responded, "I see that, but she didn't – she just kept saying to me, 'The only reason you're signing the severance agreement is to get the unemployment.'"  Tr. 103.

Stevens did not sign the severance agreement during the

---

[3] "Q. Well, I thought you had told us everything that you could remember about that spiel [that Pasquini gave during the April 7 meeting] and I didn't hear any reference to a lawyer.  Now you're saying that she said that [you didn't need to hire a lawyer] during that meeting?  A. I didn't remember that.  It was long ago.  I don't remember every single thing.  Q. But you do remember it now that I reminded you of it?  A. Yes.  Q. And it just came up?  She said, 'Oh, and you don't need to hire a lawyer?'  A. Right."  Tr. 171.

April 7 meeting.  Tr. 104.  Pasquini told Stevens that she had
seven days to consider the agreement, though in fact the
Agreement gave Stevens forty-five days to consider the agreement
and an additional seven days after signing the agreement to
revoke her signature.  Tr. 105.  Stevens took the agreement home
and signed it two days later, on April 9, 2010.  Tr. 104.
Stevens said that she "read parts" of the agreement before
signing it, found it confusing, and generally relied on
Pasquini's statement that she was only signing it to collect
unemployment.  Tr. 107.

Stevens did not realize she was giving up any legal rights,
and she did not ask anybody to help her understand the
agreement.  Tr. 122-23.

Stevens had the opportunity to discuss the document with
her boyfriend or anyone else, and she knew that she was
executing a legal document.  Tr. 108.  Stevens believed she had
seven days to consider the agreement, not realizing that the
contract actually gave her forty-five days to consider it,
because Pasquini "never told me that."  Tr. 108.  Stevens also
did not understand that she had seven days from the date of
signing to revoke the agreement.  Tr. 108-9.  Stevens noticed

the portion of the agreement, written in all capital letters, explaining that she was releasing claims in exchange for severance, but it did not have any special significance to her. Tr. 168.

Stevens believed that Liberty Mutual incurred an obligation to pay her severance because she signed the agreement.  Tr. 118. At the time she signed the agreement, the only performance management she had received was the verbal warning.  Tr. 111. She stated that if Liberty Mutual had been "at all helpful" to her in finding another job or had decreased her workload, she would have stayed despite the verbal warning.  Tr. 112.

A week or so after signing the agreement, Stevens learned that she would not get unemployment benefits until her severance pay ran out.  Tr. 110-11.  Several weeks after Stevens hand-delivered the signed severance agreement to Pasquini, Stevens began receiving severance pay pursuant to the agreement.  Tr. 109.  She received twenty-one weeks of severance pay, in accordance with the Agreement.  Tr. 109.

At some point before her severance payments ran out, Stevens went to see an attorney.  Tr. 125-26.  By May 14, 2010, she had decided to repudiate the agreement.  Tr. 128.  After

deciding to challenge the agreement, Stevens continued to receive severance payments, spent the money, and never offered to return it.  Tr. 129.  Stevens applied for unemployment compensation when her severance ran out.  Tr. 130.  She now brings claims against Liberty Mutual alleging, among other things, age discrimination in violation of state and federal statutes.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must consider the evidence submitted in support of the motion in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A material fact "is one 'that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Prop. with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty

15

Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute "is 'genuine'
if the parties' positions on the issue are supported by
conflicting evidence." Int'l Ass'n of Machinists & Aerospace
Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200
(1st Cir. 1996) (citations omitted).

If the moving party satisfies its burden, the burden shifts
to the nonmoving party to "produce evidence on which a
reasonable finder of fact, under the appropriate proof burden,
could base a verdict for it; if that party cannot produce such
evidence, the motion must be granted." Ayala-Gerena v. Bristol
Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex,
477 U.S. at 323.  If the non-moving party's "evidence is merely
colorable, or is not significantly probative," no genuine
dispute as to a material fact has been proved, and "summary
judgment may be granted." Anderson, 477 U.S. at 249-50
(citations omitted).

"The key, then, to defeating a properly supported motion
for summary judgment is the non-movant's ability to support his
or her claims concerning disputed material facts with evidence
that conflicts with that proffered by the moving party." Bryant
v. Liberty Mut. Grp., Inc., No. 11-cv-217-SM, 2013 WL 2403483,

16

*2-3 (D.N.H. May 31, 2013) (citing Fed. R. Civ. P. 56(c)).  It
follows that while a reviewing court must take into account all
properly documented facts, it may ignore a party's bald
assertions, unsupported conclusions, and mere speculation, see
Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997), as well
as those allegations "which have since been conclusively
contradicted by [the nonmoving party's] concessions or
otherwise." Chongris v. Bd. of Appeals, 811 F.2d 36, 37 (1st
Cir. 1987).  Moreover, the nonmoving party cannot create a
dispute concerning material facts simply by submitting an
affidavit that contradicts her deposition testimony without
providing an adequate explanation for that discrepancy.  See
Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st
Cir. 1994); see also Torres v. E.I. Dupont de Nemours & Co., 219
F.3d 13, 20 (1st Cir. 2000).

### III.  ANALYSIS

Stevens claims violations of various state and federal
statutes including the federal Age Discrimination in Employment
Act ("ADEA") (Count I), the Family Medical Leave Act ("FMLA")
(Count X), and the New Hampshire statute prohibiting age

discrimination (Count II).  Stevens also claims constructive

discharge (Count III), wrongful termination (Count IV), fraud

(Count V), undue influence (Count VI), fraudulent

misrepresentation (Count VII), negligent misrepresentation

(Count VIII), retaliation (Count XII), and "enhanced

compensatory damages" (Count IX).[4]  Each of these claims falls

squarely within the scope of the Agreement.[5]  Thus, if the

Agreement is valid and enforceable, it bars each of Stevens'

claims.  Accordingly, I turn to the threshold question of

whether the Agreement is enforceable.

---

[4] Although it does not affect the outcome of the motion, I note
that Counts VI, VII, and VIII, in the context of the present
case, are more properly characterized as defenses to a contract
enforcement action.  Additionally, constructive discharge,
alleged in Count III, is not a cause of action, but rather a
means by which to establish an element of a wrongful termination
claim.  See, e.g., Lacasse v. Spaulding Youth Ctr., 154 N.H.
246, 248-49 (2006).  Finally, "enhanced compensatory damages"
(Count IX) is a potential remedy, not a cause of action.  See
Precourt v. Fairbank Reconstr. Corp., 856 F. Supp. 2d 327, 344
(D.N.H. 2012).

[5] Pursuant to the Agreement, Stevens expressly released any
claims arising out of her "separation from that employment" with
Liberty Mutual; "rights or claims that [she] may have pursuant
to the Severance Plan"; rights or claims she may have pursuant
to the ADEA or the FMLA; and rights or claims she may have
pursuant to any "federal, state or local . . . law . . .
authorizing claims based upon . . . age" or arising under
"common law."  See Doc. No. 50-4.  Stevens' claims plainly fit
into these categories, and Stevens nowhere asserts otherwise.

18

Stevens argues that the Agreement was not a valid waiver of her ADEA claim (Count I) because it does not meet the requirements of the Older Workers Benefit Protection Act ("OWBPA").  See 29 U.S.C. § 626(f).  With respect to each of her other claims, Stevens argues that the Agreement is not enforceable because she signed it under duress and because her employer defrauded her into believing that the Agreement only governed severance and was not a release of claims against Liberty Mutual.  After reviewing the evidence in the light most favorable to the nonmoving party (here, the plaintiff) and drawing all reasonable inferences in her favor, I conclude that there is no genuine dispute of material facts and the Agreement is enforceable.  I therefore grant Liberty Mutual's motion for summary judgment as to Stevens' claims against it.

## A.   **Stevens' ADEA Claim and the OWBPA**

Count I of the complaint charges violations of the Age Discrimination in Employment Act ("ADEA").  29 U.S.C. § 621(b). In 1990, Congress passed the OWBPA, which amended the ADEA by adding a list of requirements that must be met in order for a waiver of ADEA claims to be enforceable.  See 29 U.S.C. § 621(f)(1); Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426

(1998). Congress intended for the OWBPA to resolve a circuit split regarding the proper criteria for determining whether an employee's waiver of rights under the ADEA was knowing and voluntary. See Am. Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 117 (1st Cir. 1998). The OWBPA states: "An individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary. . . . [A] waiver may not be considered knowing and voluntary unless at a minimum" it satisfies the enumerated requirements in § 621(f)(1):

1. It must be written in a manner calculated to be understood by the employee signing the release, or the average individual eligible to participate;

2. It must specifically refer to claims arising under the ADEA;

3. It must not purport to encompass claims that may arise after the date of signing;

4. The employer must provide consideration for the release of an ADEA claim above and beyond that to which the employee would otherwise already be entitled;

5. The employee must be advised in writing to consult with an attorney prior to executing the agreement;

6. The employee must be given at least 21 days to consider signing the release (that period is extended to 45 days if the incentive is offered to a group or class of employees); and

   7. The release must allow the employee to rescind the
      agreement for up to 7 days after signing.

Bryant, 2013 WL 2403483, at *2-3 (citing 29 U.S.C. §
626(f)(1)(A)-(G)).

      If a waiver fails to meet any single requirement, "the
release is void as to all ADEA claims." Budro v. BAE Sys. Info.
& Elec. Sys. Integration, Inc., No. 07-cv-351-SM, 2008 WL
1774961, *3 (D.N.H. Apr. 16, 2008) (citing Oubre, 522 U.S. at
426-27). Therefore, to be entitled to summary judgment on the
issue of the agreement's enforceability, Liberty Mutual must
"demonstrate that there [is] no issue of material fact as to
whether the [release] complied with each of the section 626(f)
requirements." Id. (quoting Am. Airlines, 133 F.3d at 117)
(alterations in the original).

      1.   Statutory requirements for waiver of an ADEA claim

      As in Bryant, "Liberty Mutual plainly drafted the Severance
Agreement with the requirements imposed by the OWBPA in mind."
Bryant, 2013 WL 2403483 at *5. Nevertheless, Stevens argues
that Liberty Mutual failed to satisfy two of the statutory
requirements of a valid waiver: (1) that the individual receive
consideration in exchange for the waiver, see 29 U.S.C. §
626(f)(1)(D); and (2) that the release be written in a manner

                               21

calculated to be understood by the employee, see 29 U.S.C. § 626(f)(1)(A).  Doc. No. 50-1.

### a. Consideration

Stevens claims that she received no consideration for signing the agreement in violation of § 626(f)(1)(D).  Doc. No. 50-1.  She argues that the severance pay she received did not constitute consideration because she was already entitled to severance benefits pursuant to the company's Severance Pay Plan. Doc. No. 50-1.  Her assertion is unsupported by the record.

Stevens states in a conclusory fashion that she had a right to severance benefits pursuant to the Liberty Mutual Severance Pay Plan, notwithstanding the Agreement.  See Doc. No. 50-4 at 2, Affidavit of Isabel Stevens; Doc. No. 50-1 at 15.  Stevens, however, ignores the plain language of the operative agreement, the 2010 Severance Pay Plan,[6] which states, "You are eligible to

---

[6] The parties have filed two different versions of Liberty Mutual's Severance Pay Plan ("SPP").  Stevens submitted an SPP dated March 2001 with her objection to defendant's motion for summary judgment.  Doc. No. 50-4.  After reviewing this court's Bryant decision, which referenced a 2010 Liberty Mutual SPP, I requested clarification as to which document was operative – the 2001 or the 2010 SPP - when Stevens signed the Agreement.  The distinction matters because the 2001 SPP does not clearly state that an employee must release legal claims against the company in order to receive severance benefits, while the 2010 SPP does clearly state that severance benefits are available only if the

receive Severance Benefits only if you meet one of the following criteria, *provided that you execute a release* of all employment related claims in favor of the Company and its officers and employees."  Doc. No. 58-3 (emphasis added).

Stevens was entitled to severance pay only because she signed the Agreement; she had no independent right to severance benefits pursuant to the SPP, as she claims.  Section 3 of the signed Agreement is entitled "Consideration" and states, "Employee acknowledges and agrees that Liberty Mutual's

---

employee "execute[s] a release of all employment related claims."  Doc. No. 58-3.  Thus, if the 2001 SPP were operative, Stevens would have a colorable argument that she did not receive consideration for signing the Agreement because she was entitled to severance benefits pursuant to the SPP.

Liberty Mutual supplemented the record with a copy of a February 2010 SPP and an affidavit by Christine Lahey, Vice President of Employee Relations and HR Services, stating that the 2010 SPP was operative in April 2010 when Stevens signed the Severance Agreement.  Doc. No. 58.  Stevens did not assent to the filing and instead responded to Liberty Mutual's submission with an excerpt from the deposition of Terry Bryant taken in connection with Bryant's own lawsuit against Liberty Mutual.  In the excerpt, Liberty Mutual's then-counsel Dan Schwarz stated that he could not say to a "moral certainty" that the 2010 SPP was operative in 2010.  Doc. No. 59-3.  Schwarz was not under oath.  Moreover, Stevens does not assert that the 2010 SPP was not operative, nor does she affirmatively claim that the 2001 SPP was operative.  She states merely that she "believed in good faith" that the 2001 SPP was operative.  Doc. No. 59.

Stevens has failed to identify a genuine dispute as to which SPP was operative in 2010 when Stevens signed the Agreement.

23

agreement to provide the Severance Pay to Employee constitutes fair and adequate consideration for Employee's execution of this Agreement and Employee's fulfillment of the promises made in this Agreement." Doc. No. 50-4 at 5. Stevens read this provision. Doc. No. 49-4 at 32.[7] Stevens also received a letter dated April 7, 2010, which stated, "To receive severance pay, you will be required to sign a Severance Agreement and General Release." Doc. No. 49-5. Finally, Stevens acknowledged at her deposition that she understood that she was eligible for receiving severance pay only if she signed the document.[8] This is the definition of consideration. Frye v. Hubbell, 68 A. 325, 332 (N.H. 1907) ("[T]he definition of consideration . . . is . . . . a benefit received by the promisor in exchange for the promise.").

### b.   Language of the agreement

Stevens next argues that the release was not sufficiently clear. Her assertion is meritless. In fact, it is difficult to

---

[7] "Q. …you read through the agreement at least through the end of Section 5, is that right?  A. Yes."  Tr. 123.

[8] "Q. Did you understand that if you had not signed the release and severance agreement that you would have gotten severance pay anyway?  A. No.  Q. You understood that you needed to sign that document in order to get your severance pay?  A: Yes."  Tr. 109-110.

conceive of a more clearly stated release.  First, the Agreement
is entitled "SEVERANCE AGREEMENT AND GENERAL RELEASE."  Doc. No.
49-3.  Its contents are written in simple language.  It
expressly states, "Employee acknowledges and agrees that,
pursuant to the terms of the Severance Plan, Employee would not
be entitled to receive the Severance Pay if Employee did not
sign this Agreement."  The Agreement also states in unambiguous
language that, by signing the document, Stevens waived her right
to bring any then-accrued claims against Liberty Mutual,
including those in a non-exhaustive list of more than twenty
specifically identified state and federal causes of action.  See
Bryant, 2013 WL 2403483 at *7.  Moreover, in capital letters
above Stevens' signature, the Agreement states,

> EMPLOYEE UNDERSTANDS THAT EMPLOYEE'S RIGHT TO RECEIVE
> THE SEVERANCE BENEFITS REFERENCED IN THIS AGREEMENT IS
> SUBJECT TO EMPLOYEE'S COMPLIANCE WITH THE TERMS AND
> CONDITIONS SET FORTH IN THIS AGREEMENT AND THAT
> EMPLOYEE WOULD NOT RECEIVE SUCH BENFITS BUT FOR
> EMPLOYEE'S EXECUTION OF THIS SEVERANCE AGREEMENT AND
> GENERAL RELEASE.
>
> EMPLOYEE ALSO UNDERSTANDS THAT BY SIGNING THIS
> ARGEEMENT, EMPLOYEE WILL BE WAIVING EMPLOYEE'S RIGHTS
> UNDER FEDERAL, STATE AND LOCAL LAW TO BRING ANY CLAIMS
> THAT EMPLOYEE HAS OR MIGHT HAVE AGAINST LIBERTY
> MUTUAL.

25

> EMPLOYEE HAS 45 DAYS TO CONSIDER THIS AGREEMENT.
> LIBERTY MUTUAL ADVISES EMPLOYEE TO CONSULT WITH AN
> ATTORNEY . . . PRIOR TO SIGNING THIS AGREEMENT.

Doc. No. 49-3.  The Agreement's clear and unambiguous language
stating that Stevens was waiving her right to bring legal claims
against Liberty Mutual in exchange for severance pay by signing
the Agreement satisfies the OWBPA statutory requirements.  See
Bryant, 2013 WL 2403483 at *7; Pallonetti v. Liberty Mut., 2011
WL 519407, *8 (S.D.N.Y Feb. 11, 2011).

    2.   <u>Non-statutory reasons for finding the ADEA waiver not
       knowing and voluntary</u>

     Stevens advances several other reasons, untethered to the
statutory requirements, that the waiver was not knowing and
voluntary.  She claims that the severance agreement and general
waiver should not have been combined in one document; that she
waived her ADEA claims under duress; and that she was
fraudulently induced into signing the Agreement.

     It is an open question whether non-statutory factors are
relevant to determining the validity of a release that satisfies
the OWBPA factors.  See, e.g., Syverson v. Int'l Bus. Machs.
Corp., 472 F.3d 1072, 1077 n.7 (9th Cir. 2006) ("As we conclude
that the . . . Agreement does not satisfy the threshold
statutory requirements, we have no occasion to determine whether

the 'totality of the circumstances' inquiry is the proper one
where those requirements are met."); Wastak v. Lehigh Valley
Health Network, 342 F.3d 281, 294 n.8 (3d Cir. 2003) (stating,
in dicta, that the OWBPA statutory requirements establish a
floor but not a ceiling for determining whether a waiver of ADEA
claims is knowing and voluntary).  The First Circuit has not
resolved the question, and I need not decide it here because,
even assuming that non-statutory factors are relevant to
determining the validity of the waiver, Stevens has not
identified any aspect of the Agreement that would render her
signature not knowing and voluntary.

### a.   Combination of severance agreement and waiver in one document

Stevens objects to the fact that the severance agreement
and general release were combined into one document because it
made the document "confusing."  Doc. No. 50-1.  She cites a case
from this court in support of her position.  See Doc. No. 50-1
(citing Budro, 2008 WL 1774961).  I am not persuaded that
combining the two documents had any effect on its clarity.

In Budro, the court found that a severance agreement and
general release contained in two separate documents was
presented in clear and straightforward language.  2008 WL

1774961, at *4.  The <u>Budro</u> court, however, did not rely on the fact that the severance agreement and release were separate documents to conclude that the language was clear and did not suggest that a single document containing both would be unclear.  <u>See</u> <u>id.</u>  The document Stevens signed was entitled, in all capital letters: "SEVERANCE AGREEMENT AND GENERAL RELEASE."  There is nothing inherently confusing about combining a severance agreement and release into a single document the title of which clearly states its contents, and Stevens identifies no legal authority to support her position that there is.

> **b.   Duress**

Stevens contends that her signature was not knowing and voluntary because she was told that, "unless she quickly signed" the Agreement, Liberty Mutual would fire her for "gross misconduct"; prospective employers would be told of the basis of her termination; and she would be unable to collect unemployment.  Doc. No. 50-1.  Stevens' contentions are unpersuasive for several reasons.

Under New Hampshire law, "[a]s a practical matter, the claim of undue duress is essentially a claim that the agreement was not signed voluntarily."  <u>In re Estate of Hollett,</u> 150 N.H.

39, 42 (2003) (quoting 3 C. Douglas, New Hampshire Practice, Family Law § 1.05, at 12 (2002)).  To invalidate a contract on the basis of duress, "a party must show that it involuntarily accepted the other party's terms, that the coercive circumstances were the result of the other party's acts, that the other party exerted pressure wrongfully, and that under the circumstances the party had no alternative but to accept the terms set out by the other party."  In re Yannalfo, 147 N.H. 597, 599 (2002) (quoting Goodwin R.R., Inc. v. State, 128 N.H. 595, 605 (1986)).

Here, there was no requirement that Stevens "quickly" sign the Agreement.  In fact, Stevens had forty-five days to consider the agreement, and seven days following her signature within which she could revoke the Agreement.  Doc. No. 49-3.  Those timeframes were clearly stated in the Agreement on the signature page.  Even taking Stevens' deposition testimony at face value — that she believed she had only seven days to sign the document — there was no requirement that she "quickly" or immediately sign the Agreement, and, in any event, she returned the Agreement after only two days.

Additionally, Stevens' statement that her signature was not knowing or voluntary because Liberty Mutual threatened to fire her for gross misconduct misrepresents the options available to her.  At her deposition, Stevens explained that Pasquini presented her with three options:

> [T]o quit and I wouldn't be able to collect unemployment; if I didn't quit, then Ms. Berrios would start performance management and report that I was let go for gross misconduct which would mean that I wouldn't be able to collect; or I could do the severance agreement [and] would be able to collect unemployment.

Tr. 75.  To be sure, Stevens faced a difficult choice.  A difficult choice, however, does not constitute legal coercion. "The financial stress associated with the loss of a job is not, without more, sufficient to warrant the conclusion that" her signature was not knowing and voluntary.  See Bryant, 2013 WL 2403483, *6 (citing Melanson v. Borwning-Ferring Indus., 281 F.3d 272, 277 (1st Cir. 2002)).  "To hold otherwise would be to make it virtually impossible for employers and employees to enter into binding settlements of employment disputes occasioned by job losses, lay-offs and the like."  Id. (quoting Melanson, 281 F.3d at 277).  Thus, the mere fact that Stevens found all of her options to be unpalatable does not constitute duress.

####     c.    Fraudulent inducement

Next, Stevens claims she was fraudulently induced to sign
the Agreement because Liberty Mutual told her (1) not to contact
an attorney; (2) that the Agreement was relevant only to her
right to severance; and (3) that she was not waiving her right
to pursue claims against Liberty.  Doc. No. 50-1.  For purposes
of a summary judgment motion, I consider the facts in the light
most favorable the non-moving party.  Accordingly, I accept
Stevens' contention that the human resources representative made
these statements, and that Stevens believed she was not
releasing any of her employment-related claims, despite signing
the severance agreement and general release.  Nonetheless,
Stevens cannot, as a matter of law, prevail on her claim of
fraudulent inducement.

Under New Hampshire law, fraud in the inducement is a valid
defense to a contract action and can be raised to void a
contract.  See, e.g., Nashua Trust Co. v. Weisman, 122 N.H. 397,
400 (1982).  As the party seeking to invalidate the Agreement,
Stevens must demonstrate, among other things, that her reliance
on the fraudulent statements was justifiable.  Van Der Stok v.
Van Voorhees, 151 N.H. 679, 682 (2005) (citing Snierson v.

Scruton, 145 N.H. 73, 77 (2000)).

The standard of justifiable reliance "is not that of ordinary care, but an individual standard, based upon [plaintiff's] own capacity and knowledge." Smith v. Pope, 103 N.H. 555, 559 (1961). It is, in short, a subjective standard, rather than an objective reasonable person standard. Consequently, Stevens' educational level, intelligence, experience in the business world, and common sense are all relevant in determining whether reliance was justified. See Field v. Mans 516 U.S. 59, 70–71 (1995); see also Restatement (Second) of Torts, § 541 cmt a (1977) ("Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect."); Pierce v. Atchison, Topeka & Santa Fe Ry. Co., 65 F.3d 562, 569 (7th Cir. 1995) ("Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation.") (citation omitted).

To the extent Stevens claims to have actually relied upon

fraudulent assurances from the human resources representative to
the effect that, despite signing the agreement, she could still
bring employment-related claims against Liberty Mutual, such
reliance was patently unjustified.  First, although Stevens
stated during her deposition that Pasquini told her not to
contact an attorney, she also testified that she had the
opportunity to discuss the agreement with anyone she chose, Tr.
108, and the signature page of the Agreement includes a
statement encouraging her to consult an attorney before signing
the document.  Doc. No. 49-3 at 4.  Second, considering Stevens'
education level and business experience, her interpretation of
the Agreement (that it did not require her to waive legal claims
against Liberty Mutual) "is so plainly contrary to the clear
language of the document that it is, as a matter of law,
unreasonable." Bryant, 2013 WL 2403483 at *10.

Thus, considering both statutory and non-statutory factors,
I conclude that Stevens' waiver of her ADEA claim was knowing
and voluntary.

## B.    **Waiver of Non-ADEA Claims (Counts II-XII)**

Stevens reiterates her arguments relating to duress and
fraudulent inducement with respect to her non-ADEA claims.  For

33

the same reasons discussed above in the context of the ADEA claims, these arguments are unavailing.

### 1. Duress

As already explained, Stevens had three options.  Though none appealed to her, a difficult choice among multiple unappealing options does not amount to legal coercion. Considering the plain language of the Agreement and the fact that Stevens was afforded ample time to consult with an attorney (though she chose not to), "there is no plausible basis to conclude that [she] was 'forced' to sign the Severance Agreement, or that she was under duress or any other type of legal incapacity."  See Bryant, 2013 WL 2403483 at *7.

### 2. Fraudulent inducement

Stevens also claims that Liberty Mutual fraudulently induced her to sign the agreement by telling her that "the Severance Agreement did not prevent her from bringing claims against Liberty, the Severance Agreement only applied to severance, and that she did not need to hire an attorney."  Doc. No. 50-1 at 22.

As already discussed, it is difficult to imagine a legal document that more clearly and unambiguously describes its

purpose and legal effect than the severance agreement at issue in this case.  Stevens is literate, reasonably well-educated, and intelligent.  And, given her employment history, she must be presumed to understand the purpose of the bargained-for exchange to which she agreed by signing the Agreement.  In light of these facts, Stevens' asserted interpretation of the Severance Agreement is, as a matter of law, unreasonable.

Given the record evidence, a rational and properly-instructed jury could reach only one conclusion in this case: that Stevens knowingly and voluntarily executed the Severance Agreement and released any then-accrued claims against Liberty Mutual in exchange for severance benefits, excepting only those claims for which the law will not recognize a waiver.[9]

--------

[9] Even if Stevens had signed the Agreement under fraud or duress, she may have ratified it by accepting the benefits of the contract and failing to repudiate it in a timely manner.  See Abbadessa v. Moore Bus. Forms, Inc., 987 F.2d 18, 24 (1st Cir. 1993) (holding that New Hampshire law prohibits a person seeking to rescind a contract from treating the contract as simultaneously rescinded and binding).  The Abbadessa court noted, however, that it is an open question in New Hampshire whether "a contract signed under duress is not capable of being ratified until the duress has ended."  Id. at 24 n.3.  Here, neither party offered any evidence on the issues of whether or when the duress Stevens claims she experienced was removed.  I need not address this issue because I conclude that the waiver is valid on other grounds.

### III.   **CONCLUSION**

For the foregoing reasons, I grant the defendant's motion for summary judgment (Doc. No. 49) without reaching the merits of Stevens' claims.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


July 29, 2013

cc:   John E. Lyons, Jr., Esq.
      Debra Weiss Ford, Esq.
      Douglas J. Hoffman, Esq.
      Martha Van Oot, Esq.
      K. Joshua Scott, Esq.